**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **RUTH LARA,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-1032-L-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge[1]** |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claim for social security benefits should be **AFFIRMED**.

## I.    BACKGROUND

Ruth Lara (Plaintiff) filed her applications for Disability Insurance Benefits (DIB) under Titles II of the Social Security Act on October 31, 2018, alleging disability beginning August 15, 2018. (doc. 10-1 at 211.)[2] Her claims were denied initially on November 28, 2018, and upon reconsideration on April 30, 2019. (*Id.* at 92, 99). After requesting a hearing before an Administrative Law Judge (ALJ), she appeared and testified at a hearing on August 31, 2020, which was held by telephone due to the "extraordinary circumstance" presented by the coronavirus pandemic. (*Id.* at 40, 42.) On November 4, 2020, the ALJ issued an unfavorable decision finding that Plaintiff had not been disabled from her alleged onset date of August 15, 2018, through the

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

date of her decision. (*Id.* at 34.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on November 24, 2020. (*Id.* at 11-13.) The Appeals Council denied her request for review on March 2, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5.) She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on December 2, 1974; she was 46 years old at the time of the hearing. (doc. 10-1 at 211.) She had an eleventh-grade education and could communicate in English. (*Id.* at 58-59.) She had past relevant work as a building manager. (*Id.* at 46-47, 58.)

**B.  Medical, Psychological, and Psychiatric Evidence**

On October 9, 2017, Plaintiff presented to Robert Jenkins, M.D. (Rheumatologist), at Rheumatology Associates, complaining of atypical chest pain. (*Id.* at 329.) She had morning stiffness, joint pain, joint swelling, muscle tenderness, and fatigue, but no generalized weakness and no acute distress. (*Id.* at 330, 332.) She had decreased range of motion in cervical spine, mild pain with rotation of neck, tenderness in paraspinal musculature, diffuse tenderness over the fibromyalgia tender points, mild pain with lumbar flexion or extension, and tender chest wall, but normal station and gait. (*Id.* at 333.) He opined that her pain symptoms were likely attributable to fibromyalgia. (*Id.*) She was advised to exercise and take Ambien to sleep. (*Id.* at 333, 335.)

At a follow-up visit with Rheumatologist on February 12, 2018, Plaintiff complained of atypical chest pain and fibromyalgia. (*Id.* at 320-27.) She had normal gait and station, tenderness over the fibromyalgia tender points, and mild pain with lumbar flexion or extension, but she was in no acute distress, her fibromyalgia symptoms and exam findings were stable, and she had been able to tolerate pain symptoms better since she started taking Cymbalta. (*Id.* at 325-26.)

On three occasions between March 2018 and August 2018, Plaintiff visited Michael A. Tolle, M.D. (Internist), of Texas Health Family Care. (*See id.* at 355-81.) On March 27, 2018, she requested a medication refill and indicated that Cymbalta was the "best pain medicine" she had been on since starting treatment, and that Hydrocodone helped with pain in the left posterior region. (*Id.* at 355.) She had normal range of motion, no acute findings in the orthopedic exam, "intact sensory, motor and cerebellar components" and no acute findings in the neurological exam, no acute mental status changes, and no cyanosis or edema in the extremity exam; she was "stable and "doing well". (*Id.* at 357-58.) On June 13, 2018, Plaintiff had neck discomfort and pain in the bilateral arms due to a car accident, and she was assessed with cervical strain (or whiplash) and prescribed a Medrol dose pack and a muscle relaxer. (*Id.* at 361-62.) There were no acute findings in the neurological exam, and the extremity exam revealed no cyanosis or edema. (*Id.* at 362.) On August 16, 2018, there were no acute findings in the orthopedic or neurological exams, no acute mental status changes, and no cyanosis or edema in the extremity exams. (*Id.* at 365-71, 380-81.) Internist wrote a letter dated September 20, 2018, which in its entirety stated:

> [Plaintiff] has a disabling medical condition and should be considered as a disability candidate. Please let me know if any additional information is required.

(*Id.* at 373.)

On November 12, 2018, Plaintiff completed a function report, indicating that she woke up in pain, had difficulty dressing (putting on her bra and sometimes her shoes and socks), bathing, grooming, and cooking, and she struggled with her memory and constant pain. (*Id.* at 259.) She relied on her parents and her husband to help with house chores. (*Id.* at 261.) She went outside three or four times a week, shopped by computer and independently handled her finances. (*Id.* at 262.) She had trouble walking a few yards before needing to rest, and she could forget parts of

spoken instructions, but she could follow written instructions. (*Id.* at 264.)

On November 28, 2018, state agency medical consultant (SAMC) Betty Santiago, M.D., completed a physical RFC assessment based on Plaintiff's medical records. (*Id.* at 72-74.) She opined that Plaintiff had the physical RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours and sit about 6 hours in an 8-hour workday; and push and/or pull on an unlimited basis except for the lift and/or carry limitations. (*Id.* at 72-73.) She specifically noted "[t]hat there [wa]s no indication that there [wa]s a medical opinion from any medical source" in Plaintiff's file. (*See id.* at 72.) She did not complete a mental RFC assessment. (*See id.* at 72-74.)

On December 14, 2018, Plaintiff returned to Internist with no complaints. (*Id.* at 462.) There were no acute findings in her orthopedic or neurological exams, no acute mental status changes, and no cyanosis or edema in the extremities; the musculoskeletal exam was unremarkable. (*Id.* at 462-63.) She had stable energy level, was medication-compliant and "stable" on it with no reported side effects, and was prescribed Norco. (*Id.*)

On February 24, 2019, Plaintiff's husband completed a function report. (*Id.* at 278-85.) He indicated that she was unable to sit for "extended periods", use her hands or fingers to write or type, or retain information due to memory problems. (*Id.* at 278.) He checked boxes indicating that Plaintiff had trouble seeing, hearing, lifting, reaching, squatting, bending, standing, kneeling, climbing stairs, walking (but did not use an assistive walking device), completing tasks, concentrating, understanding and following instructions. (*Id.* at 278, 283-84.) She had trouble dressing, using the restroom and sleeping, due to pain. (*Id.* at 278-79.) Contact with water hurt her, and most days she stayed in bed, but she went outside once or twice a week. (*Id.* at 279.) She could talk, pay attention, get along with others, pay bills and count change, but her husband handled all

4

the finances. (*Id.* at 281, 283-84.) She had trouble with stress and depression. (*Id.* at 284.)

On March 26, 2019, SAMC Myron Watkins, M.D., completed a physical RFC assessment based on the medical evidence, on reconsideration of Plaintiff's application for benefits. (*Id.* at 86-88.) He affirmed SAMC Santiago's findings and stated that the additional medical evidence, i.e., treatment notes from Rheumatologist and Internist, did not change the initial finding. (*Id.* at 87.)

On April 23, 2019, Plaintiff submitted to a psychological consultative examination with Julie Duncan, Ph.D. (Psychologist). (*Id.* at 467-72.) She was alert, oriented times four, and participated appropriately in the interview; there was no evidence of loose associations, flight of ideas, circumstantial speech or tangential speech. (*Id.* at 469-70.) She reported chronic pain that limited her ability to drive, cook, and complete tasks in a timely and appropriate manner, but she managed her money independently and shopped for a few items. (*Id.* at 468, 470.) She had stable affect but endorsed significant symptoms of depression and poor ability to handle stress. (*Id.* at 470.) She reported "memory fog" but was able to recall her age, birthdate, the examiner's name, the presidents' names backwards from Trump to Bush, and three of three words immediately but one out of three words after a five-minute delay. (*Id.*) She had problems focusing, was unable to do "serial sevens" or repeat six numbers backwards but could repeat six numbers forward, spell "world" forward and backwards, name common objects, follow directions, copy a simple design, read a sentence, and repeat and write a simple sentence. (*Id.* at 470.) She had average intelligence, fair abstract thinking, good immediate memory and judgment, and "fair to good" long-term memory and insight. (*Id.* at 469-71.) She had a "guarded" prognosis and "psychological symptoms of distress and medical problems" but was "generally stable" if she had family support. (*Id.* at 471.) Psychologist diagnosed her with major depressive disorder, recurrent, severe, and a somatic symptom disorder, with predominant pain, persistent, moderate; she concluded that Plaintiff had

5

limitations with sustained concentration and persistence but retained the ability to understand, remember and apply information, relate to others and adapt.[3] (*Id.*)

On April 25, 2019, Plaintiff presented to Internist for a medication refill. (*Id.* at 540-43.) She was struggling with chronic pain. (*Id.* at 540.) There were no acute findings in the neurological exam, the extremities showed no cyanosis or edema, and the musculoskeletal exam was unremarkable. (*Id.* at 542.) She was stable on medications and continued on Norco. (*Id.*)

On April 26, 2019, state agency psychological consultant (SAPC) Stephen Drake, Ph.D., completed a psychiatric review technique (PRT) based on Plaintiff's medical records. (*Id.* at 83-85.) He concluded that she retained the ability to understand and remember simple instructions on a sustained basis; carry out simple instructions, make simple decisions, and maintain concentration and attention for extended periods; and respond appropriately to others, work situations, and changes in a routine work setting. (*Id.*) The same day, SAPC Drake completed a mental RFC assessment based on her medical records. (*Id.* at 88-89.) He concluded that she had limitations with understanding, memory, and sustained concentration and persistence but retained the ability to have social interactions and adapt. (*Id.*)

On January 10, 2020, Plaintiff met with Internist for a physical. (*Id.* at 546.) She reported

---

[3] Psychologist opined that Plaintiff had the following functional capacity:

1. She can understand, remember, and apply information. She has the abilities to learn, recall, and use information to perform work activities. She can carry out tasks with three or more step oral instructions and use reason and judgment to make work-related decisions.
2. She has the abilities to relate to and work with supervisors, coworkers, and the public.
3. *She would struggle to concentrate, persist, and maintain pace with the abilities to focus attention to work activities and stay on task at a sustained rate.*
4. She can adapt and manage herself.

(doc. 10-1 at 471) (emphasis added).

an adequate energy level, that water hurt her skin, and that Cymbalta affected her sleep.[4] (*Id.* at 546, 550.) She complained of fatigue, not being able to get out of bed and pain that shot up to her jaw. (*Id.*) There were no acute findings in the orthopedic or neurological exams, no acute mental status changes, and the extremities showed no cyanosis or edema. (*Id.* at 549.) She was assessed with fibromyalgia, malaise and fatigue, costochondritis, memory loss, neurosensory deficit and neurocognitive deficits. (*Id.* at 549-51.)

On May 29, 2020, Plaintiff presented to the emergency department at Texas Health Rockwall (Texas Health), for abdominal pain that had lasted two or three days. (*Id.* at 589-90.) She appeared to be uncomfortable but was cooperative and in no distress with normal mood, affect, and behavior; she also had normal muscle tone and no distension in the abdominal exam. (*Id.* at 591-92.) An ultrasound revealed a cystic lesion within the left ovary. (*Id.* at 595.)

On June 8, 2020, Plaintiff was examined by Clark Griffith, M.D. (*Id.* at 569, 573.) She was oriented times four and did not appear anxious, depressed, irritable or in acute distress; no gross neurological abnormalities were observed. (*Id.* at 573.)

On June 24, 2020, Plaintiff returned to Texas Health with right flank pain. (*Id.* at 583-89.) Christopher D. Skillern, M.D., noted she was alert, oriented times three and in no acute distress. (*Id.* at 585.) The musculoskeletal exam revealed a normal range of motion and no swelling; imaging revealed a right renal mass and no acute abnormality in the neck. (*Id.* at 585-87.)

On July 2, 2020, Plaintiff presented to Tammy T. Nguyen, PA-C at Texas Back Institute. (*Id.* at 600-04.) Plaintiff was alert, oriented, and cooperative; she was sitting comfortably and did not have trouble getting out of the chair. (*Id.* at 602.) There was no evidence of spasm or trigger

---

[4] Internist indicated that Savella might be an "option[a]l" medication. (doc. 10-1 at 550.)

point in the cervical spine (except for tenderness upon the upper trapezius with deep palpation bilaterally), the range of motion was pain free and normal in all directions, the thoracic spine was nontender with no evidence of spasm or trigger point, and the lower and upper extremities were symmetrical and normal. (*Id.* at 603.) Her paravertebral muscles were tender throughout with light and deep palpation, the "[s]pinous processes" were nontender, and the straight leg raises were negative bilaterally. (*Id.*) Imaging revealed degenerative changes at L4-S1 with decreased disc height. (*Id.*)

On July 14, 2020, Plaintiff presented to the emergency department at Methodist Richardson Medical Center for a robotic-assisted laparoscopic right partial nephrectomy and intraoperative renal ultrasound; she was discharged with no complications three days later. (*Id.* at 637-39.)

On July 24, 2020, Plaintiff presented to Kashif Irfan, M.D. (Pain Physician), for pain management. (*Id.* at 711-14.) Pain Physician noted that Plaintiff was alert, oriented, and in no acute distress. (*Id.* at 711.) There was minimal tenderness at C5-C7 region on both sides; anterior cervical flexion was 45 degrees and caused worsening pain; the cervical extension was 75 degrees; the left lateral rotation was 65 degrees; the right lateral rotation was 65 degrees; and cervical facet loading was mildly positive bilaterally. (*Id.* at 712.) Palpation of the lumbar facet revealed minimal tenderness on both sides at L4-S1; there was tightness and tenderness over the lumbar intervertebral spaces on palpation; palpation of the bilateral sacroiliac joint area revealed minimal tenderness bilaterally; anterior lumbar flexion caused pain; lumbar extension and rotation caused worsening pain; and lumbar facet loading was positive bilaterally. (*Id.*) She had 5/5 motor strength and normal sensation in all tested areas, and there was no evidence of instability, erythema, warmth or significant swelling in the bilateral knees, but there was mild crepitus and mildly worsening pain on passive range of motion. (*Id.*)

The same day, Plaintiff submitted to lumbar spine magnetic resonance imaging (MRI), which revealed multilevel spondylitic changes, most pronounced at L4-L5; right paracentral disk extrusion at L1-L2; small central disc protrusion at L3-L4; mild to moderate bilateral foraminal stenosis at L4-L5; and postoperative signal changes involving the right kidney. (*Id.* at 605-06.)

On July 26, 2020, Plaintiff underwent an abdominal and pelvic computed tomography (CT) scan. (*Id.* at 704-05.) It revealed a region of hypoenhancement along the right renal upper pole and subcentimeter retroperitoneal lymph nodes. (*Id.* at 705.) It also revealed colonic diverticulosis without evidence of acute diverticulitis, a normal appendix, free fluid in the pelvis, an oblong cystic structure in the left adnexa, and nonobstructive stones within the renal lower poles. (*Id.*)

On August 7, 2020, Plaintiff returned to Pain Physician for chronic low back pain. (*Id.* at 715-17.) The cervical spine was tight to palpation, and palpation of the cervical facet revealed minimal tenderness at C5-C7 region on both sides. (*Id.* at 715.) Anterior cervical flexion caused worsening pain and was 45 degrees, cervical extension was full at 75 degrees, and left and right lateral rotations caused worsening pain and were 65 degrees. (*Id.*) Palpation of the lumbar facet again revealed minimal tenderness at L4-S1 region and tightness and tenderness over the lumbar intervertebral spaces on palpation; anterior lumbar flexion caused pain and was 80 degrees; lumbar extension caused pain and was 15 degrees. (*Id.*) Examination of the bilateral knees revealed no evidence of instability, erythema, warmth, significant swelling or evidence of effusion, but there was mild crepitus and mildly worsening pain on passive range of motion. (*Id.*)

On August 10, 2020, Sheila Behimehr, NP (Nurse Practitioner) at Rheumatology Associates found decreased range of motion in the cervical spine, mild pain with cervical rotation, and tenderness in paraspinal musculature. (*Id.* at 719-24.) Although there was diffuse tenderness over the fibromyalgia tender points, Plaintiff was not in acute distress, and she had normal gait

and station as well as muscle strength of 5/5 in the bilateral deltoids and 4/5 in the bilateral triceps, biceps, hip flexors and quadriceps. (*Id.* at 720.) She struggled with the "O test" and distal strength test due to pain in her hands, and there was tenderness to palpation of the lumbar paraspinal musculature and mild pain with lumbar extension. (*Id.*) The straight leg raise was negative bilaterally, but she was tender to palpation on the left trochanteric bursa region. (*Id.*)

On August 27, 2020, Internist completed a fibromyalgia questionnaire. (*Id.* at 725-28.) He checked boxes to indicate that her severe condition existed and persisted since August 15, 2018, she had suffered widespread pain for at least three months, and she had at least 11 positive tender points, which he circled on a diagram. (*Id.* at 725-26, 728.) Internist opined that she could not, on a continuing basis, lift less than 10 pounds frequently and 10 pounds occasionally; consistently perform work requiring her to be on her feet more than 2 hours in an 8-hour workday; or finger, handle or reach overhead or forward with either hand or arm on a sustained basis in an 8-hour workday. (*Id.* at 727.) She would require a 4 hour-rest break in an 8-hour workday and would likely miss an average of 10 of more days of work per month due to her medical condition. (*Id.* at 728.) He checked a box to indicate he had ruled out other disorders in diagnosing her with fibromyalgia, and he wrote "labs attached" in response to a question on what laboratory findings or imaging he had conducted. (*Id.* at 726.) No laboratory findings were attached, however.

The same day, Rheumatologist completed an identical fibromyalgia questionnaire. (*Id.* at 729-32.) He agreed with Internist's findings, except he concluded she could finger, handle and reach overhead and forward with either hand or arm occasionally, i.e., up to one-third of an 8-hour workday; would require a 30 minute-rest break during an 8-hour workday; and would likely miss an average of 8 days of work per month due to her medical condition. (*Id.*) He did not circle the positive tender points on the diagram and instead wrote "N/A". (*Id.* at 729.) He wrote "in medical

10

records" to explain how he diagnosed her with fibromyalgia. (*Id.* at 730.)

On September 4, 2020, Psychologist completed a medical source statement, consisting of a two-page check-box form to rate how Plaintiff's mental condition interfered with her ability to do "basic mental activities of work" on a sustained basis. (*Id.* at 734-35.) She expressly based it on the April 2019 consultative evaluation and stated it was not a current assessment. (*Id.* at 735.) She concluded that Plaintiff had "[n]o significant loss" of ability to:

1. carry out simple one- or two-step instructions and … deal with standardized situations with occasional or no variables in or from such situations on the job;
2. carry out very short and simple instructions; and
3. ask simple questions or request assistance.

 (*Id.* at 734-45.) She had "[s]ome loss" of ability to:

1. carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations;
2. interact appropriately with the general public; and
3. accept instructions and respond appropriately to criticism from supervisors.

(*Id.*) She was "seriously" limited in her ability to:

1. carry out instructions furnished in written, oral, or diagrammatic form and deal with problems involving several concrete variables in or from standardized solutions;
2. maintain attention and concentration for extended periods (approximately two hour intervals);
3. sustain ordinary routine without special supervision;
4. work in coordination with or in proximity to others without being unduly distracted by them;
5. get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; and
6. respond appropriately to changes in a routine work setting.

(*Id.*) She was "[e]xtreme[ly]" limited in her ability to:

1. perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
2. complete a normal work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and
3. cope with normal work stresses without exacerbating psychologically based symptoms.

11

(*Id.*) Checked boxes indicated that Plaintiff was able to manage benefits in her own best interest and that her limitations existed and persisted since at least August 15, 2018. (*Id.* at 735.)

## C. <u>Hearing</u>

On August 31, 2020, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (*Id.* at 40-66.) Plaintiff was represented by an attorney. (*Id.* at 42.)

### 1. *Plaintiff's Testimony*

Plaintiff testified that she had an eleventh-grade education[5] and had worked her way up to becoming a property manager and senior property manager. (*Id.* at 47, 58-59.) As a senior property manager, she hired and fired staff and had more staff and dealt with more property than a property manager. (*Id.* at 47.)

Plaintiff was approved to work from home, and she did that a lot, but the pain from fibromyalgia also caused her to miss deadlines and prevented her from typing reports in a timely manner. (*Id.* at 48.) She stopped working on August 15, 2018, due to a lot of work absences that year; she received severance and vacation pay. (*Id.*)

After leaving that job, Plaintiff did not look for another job because she had worsening pain throughout her body and she knew she would not be able to drive. (*Id.*) Because she received unemployment benefits through the first quarter of 2019 (as indicated on her certified earning record), she submitted her resume to different companies but did not get any callbacks. (*Id.* at 48-49.) She knew she could not work as a property administrator, so she applied for other property management jobs, from administrative assistant to assistant manager. (*Id.* at 49.)

Plaintiff was unable to work full-time on a regular basis due to pain from morning to night;

---

[5] The ALJ noted that the record showed she had earned a GED. (doc. 10-1 at 58-59.)

12

it would keep her up and she would wake up "completely exhausted" and unable to get out of bed. (*Id.*) Her ability to walk improved throughout the day, but going to medical appointments exhausted her, and she needed a couple of days to recover from them. (*Id.* at 49-50.) She stopped taking daily showers because they were painful and made her go back to bed to rest. (*Id.* at 50.)

Internist referred Plaintiff to Rheumatologist, who ran tests. (*Id.* at 50, 53.) Duloxetine had helped her a lot; she was able to get out of bed, go sit in another room for 30 minutes and then return to bed. (*Id.* at 49-50, 53.) She had been advised to do yoga but it was painful, so she had plans to ask a doctor for stretching exercises for her back. (*Id.* at 50.) She had been treated by Pain Physician, but his treatments only addressed her neck and back problems and not her fibromyalgia symptoms. (*Id.*) A doctor she had visited in March had moved offices, and she could not get anyone to drive her there. (*Id.* at 50-51.) He had given her a referral to a nearby doctor's office, but she was still on the waiting list for an appointment. (*Id.* at 51.)

After Rheumatologist diagnosed Plaintiff with fibromyalgia in 2017, she continued to work for a couple years. (*Id.*) She had started to miss work because she could not "function correctly", and her fibromyalgia symptoms got worse with every procedure she had, i.e., heart catheterization surgery in 2017 and a partial hysterectomy in 2020. (*Id.*)

To do house chores, Plaintiff relied on her husband and her retired parents, who helped from Friday through Sunday. (*Id.* at 51-52.) She could not do "not much" because even if an activity did not tire her, it would cause her pain for a couple of days. (*Id.* at 52.)

On cross-examination, Plaintiff testified that she had a lot of migraines and felt pain in her "entire body", including her fingers, wrist, elbow, chest, back, feet, joints, hips and head. (*Id.*) It was hard for her to do "much of anything" with her hands and fingers, which hurt on a regular basis. (*Id.*) She no longer used a computer or keyboard; her phone use was limited to voice

command instead of texting because if she used the keyboard, she would "pay for it". (*Id.* at 57.) She had changed her forks because the texture was too rough. (*Id.* at 56.) She testified she "d[id not] touch things because that would just cause much pain" and she "wouldn't be able to use [her] hands the rest of the day." (*Id.*)

Plaintiff took pain medication, but it "control[led]" no more than 50 percent of her pain. (*Id.* at 53.) Even if she were to lie in bed for 14 hours, she would not feel rested when she woke up. (*Id.*) Moving her joints caused a lot of pain. (*Id.*) Internist initially thought that she had lupus, but illnesses like lupus and multiple sclerosis were excluded by Rheumatologist's testing. (*Id.* at 53-54.) Her thyroid was "good", and she did not take medication for it. (*Id.* at 54.)

On July 14, 2020, Plaintiff was diagnosed with renal cell carcinoma. (*Id.*) She had to go to the emergency room due to pain in her back and lower abdomen. (*Id.*) A CT scan showed cancer on her right kidney above the left ovary. (*Id.*) She began to have pain in her kidney after a part of it was removed, but she was told the pain was due to the fibromyalgia, not the kidney. (*Id.* at 55.)

In the morning, Plaintiff was able to get up, dress, brush her teeth and use the restroom. (*Id.* at 56.) She no longer did other things due to exhaustion and "more pain". (*Id.*) She no longer moved as fast as she used to because of pain and stiffness, but also from the fear of falling, since she had fallen a lot or dropped things. (*Id.* at 57.) She would also return to bed due to losing her balance, dizziness, or unbearable pain in her legs or feet. (*Id.* at 55.) She could only lie on her back in bed, which had caused stress and problems on her back. (*Id.*)

Plaintiff no longer ate meat or dairy because they made her ill. (*Id.* at 56.) Her husband prepared her meals, and she would get them from the refrigerator. (*Id.*)

When something was new to Plaintiff, she knew what she wanted to say, but the words would not come out of her mouth; it was as if she said things "backwards". (*Id.* at 57.) She could

not focus and had a lot of memory loss; it was mostly short-term but also long-term loss that she did not have a year earlier. (*Id.*) She used to be a multi-tasker, but she needed to hear something a few times before she learned it because it was hard for her to process new information. (*Id.*)

### 2. VE's Testimony

The VE testified that Plaintiff had past relevant work as a building manager (DOT 187.167-190, light work, SVP-7).[6] (*Id.* at 58.)

The VE first considered a hypothetical individual who had Plaintiff's age, education and past relevant work, and could lift, carry, push and pull 10 pounds frequently[7]; stand or walk for 6 hours and sit for 6 hours out of an 8-hour workday; frequently climb stairs and occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes or scaffolds; frequently handle and finger bilaterally; and perform simple and routine tasks and make simple work related decisions. (*Id.* at 59.) The individual could not perform Plaintiff's past work but could work as a hand packager (DOT 559.687-074, light, SVP-2), with 80,000 jobs nationally; housekeeping cleaner (DOT 323.687-014, light, SVP-2), with 158,000 jobs nationally; and cashier II (DOT 211.462-010, light, SVP-2) with 837,000 jobs nationally. (*Id.* at 60.)

The ALJ modified the first hypothetical to include "more than" occasional handling and fingering. (*Id.* at 61.) The VE testified that the three light jobs would be eliminated. (*Id.*)

The ALJ again modified the first hypothetical to include only occasional handling and fingering. (*Id.*) The VE testified that the individual could work as a tanning salon attendant (DOT 359.567-014, light, SVP-2), with 40,000 jobs nationally; fruit distributor (DOT 921.685-046, light,

---

[6] DOT stands for the Dictionary of Occupational Titles, and SVP stands for Specific Vocation Preparation.

[7] The transcript reflects that part of this testimony relating to how much weight the first hypothetical individual could occasionally lift, carry, push or pull was "inaudible". (*See* doc. 10-1 at 59.)

SVP-2), with 60,000 jobs nationally; and conveyor line bakery worker (DOT 524.687-022, light, SVP-2), with 45,000 jobs nationally.[8] (*Id.*)

A second hypothetical individual had the same limitations as the first but was also limited to sedentary work and could lift, carry, push or pull "up to" 10 pounds occasionally and "less than" 10 pounds frequently; stand or walk for 2 hours and sit for 6 hours out of an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps or stairs (but not climb ladders, ropes or scaffolds). (*Id.* at 60.) The individual could not perform Plaintiff's past work[9] but could work as a document preparer (DOT 249.587-018, sedentary, SVP-2), with 46,000 jobs nationally; final assembler (DOT 713.687-018, sedentary, SVP-2), with 28,000 jobs nationally; and stuffer (DOT 731.685-014, sedentary, SVP-2), with 19,000 jobs nationally. (*Id.* at 60-61.)

The ALJ modified the second hypothetical to include "more than" occasional handling and fingering. (*Id.* at 61.) The sedentary jobs would be eliminated. (*Id.*)

The ALJ again modified the second hypothetical to include only occasional handling and fingering. (*Id.*) The VE testified that the individual could work as a call out operator (DOT 237.367-014, sedentary, SVP-2), with 22,000 jobs nationally. (*Id.* at 61-62.)

On cross-examination, the VE testified that the tolerance for absenteeism, i.e., calling off the day of, at both the light and sedentary jobs was one day per month. (*Id.* at 62.) Most employers would consider leaving early after four or five hours of work, due to a medical condition, as an absence, and it would affect the individual's ability to maintain that job. (*Id.*)

The attorney modified the first and second hypothetical individuals to having difficulty

---

[8] The latter two were quality control jobs. (doc. 10-1 at 61.)

[9] The record indicates that the ALJ "presume[d]" that the second hypothetical individual could not perform Plaintiff's past work so she "move[d] directly" to other work in the national economy. (*See* doc. 10-1 at 60.)

with concentration, persistence and maintaining pace and producing only 90 percent versus the employer's expectation on a "regular basis" (i.e., producing 10 percent less on an ongoing basis), despite any retraining or other efforts. (*Id.* at 62-63.) That would affect the individual's ability to maintain employment. (*Id.* at 63.) Similarly, producing 10 percent "incorrectly" would affect an individual's ability to maintain employment. (*Id.*)

The attorney again modified the first and second hypothetical individuals to requiring a break of 30 minutes "throughout the day", in addition to the morning, lunch and afternoon break. (*Id.*) Such an individual could not maintain competitive employment. (*Id.* at 64.)

The attorney modified the first and second hypothetical individuals, who were already limited to occasional handling and fingering, to include also occasional reaching forward (i.e., extending the hands between the waist and the shoulder level). (*Id.*) Such an individual could still work as a tanning salon attendant, fruit distributor, conveyor line bakery worker and call out operator. (*Id.*)

To the best of VE's knowledge, nothing in his testimony was in conflict with the DOT and its companion publications. (*Id.*) However, because they were not addressed by the DOT, the VE's testimony regarding absenteeism, additional breaks and reduced or incorrect production of items, was based solely on his 25 years of experience working as a rehabilitation counselor. (*Id.*)

## D.  ALJ's Findings

The ALJ issued an unfavorable favorable decision on November 4, 2020. (*Id.* at 16.) At step one, she found that Plaintiff had met the insured status requirements through December 31, 2023, and had not engaged in substantial gainful activity since the alleged onset date of August 15, 2018. (*Id.* at 21.) At step two, she found the severe impairments of fibromyalgia, obesity, depression and a somatic symptom disorder, and the non-severe impairments of renal carcinoma

status post partial nephrectomy, costochondritis, Wolff Parkinson White syndrome, and lumbar degenerative disc disease. (*Id.* at 21, 25.) Despite those impairments, at step three, she found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the social security regulations. (*Id.* at 25-27.) She specifically considered the listings and rulings relating to fibromyalgia (11.00ff, 14.00ff; Social Security Ruling (SSR) 12-2p), depression (12.04), and a somatic symptom disorder (12.07). (*Id.* at 25.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work, as defined in 20 C.F.R. §§ 404.1567(b), limited to occasionally lift, carry, push, and pull up to 20 pounds and frequently 10 pounds; stand or walk for 6 hours and sit for 6 hours out of an 8-hour workday; occasionally balance, stoop, kneel, crouch, crawl, climb ladders, ropes, or scaffolds but frequently climb ramps and stairs; frequently handle and finger bilaterally; and perform simple, routine tasks and make simple work-related decisions. (*Id.* at 27-28.) At step four, the ALJ determined that Plaintiff was unable to perform her past work. (*Id.* at 32.) At step five, the ALJ found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 33.) The ALJ determined that Plaintiff had not been disabled, as defined by the Social Security Act, from her alleged onset date of August 15, 2018, through the date of her decision. (*Id.* at 34.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUES FOR REVIEW

Plaintiff lists the following issues for review:

1. There must be a discernible logic bridge between the evidence and the ALJ's findings on the persuasiveness of medical opinion evidence and the prior administrative medical findings. The ALJ did not establish such discernable logic bridge between the evidence and h[er] persuasiveness findings. Did the ALJ commit reversible error in evaluating the persuasiveness of the medical source opinions and the prior administrative medical findings?

2. An individual's symptoms are evaluated by the extent they can reasonably be accepted as consistent with the medical and other evidence of record. The ALJ required that [Plaintiff]'s reported symptoms be "entirely consistent" with the medical and the other evidence. Did the ALJ apply an inappropriate standard in evaluating the consistency of [Plaintiff]'s reported symptoms with the evidence of record?

(doc. 15 at 5.)

### A.  **Medical Source Opinions**

Plaintiff contends that the ALJ did not establish a "discernible logic bridge" between the evidence and her finding on the persuasiveness of the medical opinions of Rheumatologist, Internist and Psychologist. (doc. 15 at 5.) The Commissioner responds that the ALJ "properly considered the opinions in the record." (doc. 16 at 3.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from h[er] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). A medical opinion is a statement from a medical source about what the claimant can still do despite her impairments and whether she has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. *Id.* §§ 404.1513(a)(2), 416.913(a)(2).

21

The guidelines provide that the ALJ will explain in her determination or decision how persuasive she finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record."[10] *Id.* §§ 404.1520c(b)(2), 416.920c(b). Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. *Id.* §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support her own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See id.* §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ must explain how she "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).[11]

"There is limited case law concerning what constitutes a sufficient 'explanation' of supportability and consistency under 20 C.F.R. § 404.1520c(b)(2)." *Georgopoulos v. Comm'r,*

---

[10] When a medical source provides multiple medical opinions, the ALJ will articulate how she "considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors," but she is not required to articulate how she considered each medical opinion or prior administrative medical finding from one medical source individually. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1).

[11] She may, but is not required to, explain how she considered the remaining factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

*SSA*, No. 4:21-CV-00192ALMCAN, 2022 WL 3023247, at *8 (E.D. Tex. July 8, 2022), *report and recommendation adopted*, No. 4:21-CV-192, 2022 WL 3018417 (E.D. Tex. July 29, 2022); *see Hubbard v. Comm'r of Soc. Sec.*, No. 4:20-CV-00588-BP, 2022 WL 196297, at *3 (N.D. Tex. Jan. 21, 2022) (same) (citation omitted).

> The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof.

*See Georgopoulos*, 2022 WL 3023247, at *9 (citing *Luckett v. Kijakazi*, No. 4:20-CV-04002, 2021 WL 5545233, at *4 (S.D. Tex. Nov. 26, 2021) (citing *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted)); *see also Pearson v. Comm'r*, No. 1:20-CV-166-HSO-RPM, 2021 WL 3708047, at *5 (S.D. Miss. Aug. 11, 2021) ("Stated differently, there must be a discernible 'logic bridge' between the evidence and the ALJ's persuasiveness finding.") (citation omitted)). "At a minimum, the ALJ's discussion must give enough reasons to permit meaningful judicial review." *Dominick S. v. Kijakazi*, No. 3:20-CV-03473-E-BT, 2022 WL 2874705, at *4 (N.D. Tex. May 12, 2022), *report and recommendation adopted sub nom. Simonetti v. Kijakazi*, No. 3:20-CV-03473-E-BT, 2022 WL 2872490 (N.D. Tex. July 20, 2022) (citation omitted); *see Gonzales v. Kijakazi*, No. 4:20-CV-00270, 2021 WL 3777181, at *3 (S.D. Tex. Aug. 3, 2021) (finding the ALJ's "quite brief" and "cursory explanation" of the supportability and consistency of a medical opinion satisfied the discussion requirement under § 404.1520c because it "discusse[d] medical evidence that is not consistent with and does not support the [treating physician's] opinion" on plaintiff's breathing limitations). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole

responsibility for a disability determination rests with her. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted); *see also* SSR 96-6p, 1996 WL 374180, at *4.

The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are "brief and conclusory" and "lack 'explanatory notes' or 'supporting objective tests and examinations.'" *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (citing *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)).  District courts in this circuit have found that under the new regulations, brief and conclusory opinions unsupported by relevant medical evidence lack supportability. *See*, *e.g., Bruen v. Kijakazi*, No. 1:20-CV-278 LGI, 2022 WL 452411, at *3 (S.D. Miss. Feb. 14, 2022) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best .... [but when] these so-called reports 'are unaccompanied by thorough written reports, their reliability is suspect.'") (citation omitted); *Benson v. Saul*, No. 3:20-CV-1974-E-BH, 2022 WL 868706, at *16 (N.D. Tex. Mar. 8, 2022), *report and recommendation adopted*, No. 3:20-CV-1974-E-BH, 2022 WL 865886 (N.D. Tex. Mar. 23, 2022) (finding that the lack of persuasiveness of the check-box form goes to its lack of supportability); *Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860 *8 (N.D. Tex. Dec. 4, 2020) (illustrating how less persuasive a "brief and conclusory" check-box questionnaire stands in comparison to a narrative statement, which contains substantive explanation) (citing *Heck*, 674 F. App'x at 415, and *Foster*, 410 F. App'x at 833)).

Some of these courts have found that the ALJ satisfies the required discussion on the supportability and consistency of "brief and conclusory" opinions "lack[ing] 'explanatory notes' or 'supporting objective tests and examinations'" when her decision reflects consideration of these two factors as well as a review and analysis of the objective record. *See*, *e.g., Anthony D. v.*

*Comm'r of Soc. Sec. Admin.*, No. 3:19-CV-2900-X-BK, 2021 WL 9315235, at *5 (N.D. Tex. Aug. 25, 2021) ("Details about why the ALJ gave a specific opinion little weight, combined with the entire review and analysis of the objective record, can satisfy the ALJ's duty under the regulations.") (citing *Stephens*, 2020 WL 7122860, at *7), *report and recommendation adopted sub nom. Anthony D. v. Commissioner, Soc. Sec. Admin.*, No. 3:19-CV-2900-X-BK, 2022 WL 2900999 (N.D. Tex. July 22, 2022) (agreeing with the magistrate judge that "[w]hile the ALJ must explain how she considered the supportability and consistency factors for a medical source's medical opinions, there are no magic words or specific amount of explanation required"); ("The ALJ's reasons for assigning only 'little weight' to Dr. Pak's medical source statement, combined with his review and analysis of the objective record, satisfy his duty under the regulations.").

Here, although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1520c(c)(1)-(5), she specifically stated she considered the opinion evidence and prior administrative medical findings in accordance with the requirements of 20 C.F.R. § 416.1520c, and her decision reflects consideration of supportability and consistency, the two most important factors in evaluating the persuasiveness of medical opinions. (*See* doc. 10-1 at 28-31 (citing *id.* at 319-41, 355-81, 462-63, 467-74, 540-43, 718-35.))

### 1. Internist's Fibromyalgia Questionnaire

Plaintiff argues that the ALJ "ignored" Internist's fibromyalgia questionnaire and his finding that she had at least 11 positive tender points "at her occiput, low cervical, trapezius, second rib, supraspinatus, and gluteal sites." (doc. 15 at 21.)

Internist physically examined Plaintiff at least six times between 2018 and 2020. (doc. 10-1 at 355-81, 462-63, 540-43.) Plaintiff had "intact" sensory, motor and cerebellar components on

the extremity exams, no acute findings on the neurological exams and no acute mental status changes in five of those examinations. (*Id.* at 22-23 (citing *id.* at 357, 361, 367-68, 381, 462-63, 542, 549); *see id.* at 361.) She had normal range of motion and no acute findings on the orthopedic exams at least three times. (*Id.* (citing *id.* at 357, 367, 381, 388, 423, 430, 549.)) Her musculoskeletal exam was normal or unremarkable in December 2018 and April 2019. (*Id.* (citing *id.* at 462-63, 542, 549.)) She also had a stable or adequate energy level, was prescribed pain medication, was medication-compliant, and reported no medication side effects other than sleeping issues, for which a medication was recommended. (*Id.* (citing *id.* at 462-63, 542, 546, 550.))

The ALJ considered Internist's August 2020 fibromyalgia questionnaire, which was a check-box form, and his opinion that:

> [Plaintiff] could not lift less than ten pounds frequently and ten pounds occasionally on a consistent basis in a work situation. She could not consistently perform work requiring her to be on her feet more than two hours in an eight-hour workday. She ha[d] a negligible ability to reach overhead, reach forward, handle, and finger with the bilateral arms and hands. She w[ould] require rest breaks lasting more than four hours during a workday. She [wa]s likely to miss an average of three or more days per month due to periodic acute exacerbations. Specifically, she would miss ten days or more per month.

(*Id.* at 31 (citing *id.* at 725-28)) (internal citations omitted). The ALJ expressly found Internist's opinion "not persuasive" because it was inconsistent with the "normal examination findings" in his treatment records. (*Id.* at 31 (citing *id.* at 725-28.)) She considered that Plaintiff's visits with Internist showed she had normal or unremarkable musculoskeletal exams, largely normal gait and station, compliance with medication, stability on medication, and adequate energy. (*Id.* at 22-23, 31 (citing *id.* at 357-58, 361, 380-81, 388-89, 394, 430-31, 462-63, 540, 542, 546, 548-49.)) She also considered that Plaintiff reported she had severe pain, no longer did house or yard work and had trouble cooking, grooming and bathing, but rode in the car, went outside a few times a week,

26

and shopped by computer. (*Id.* at 31 (citing *id.* at 259-66.)) By properly considering and summarizing all the record, she did not err in determining the persuasiveness of Internist's questionnaire. *See Donohue v. Comm'r, Soc. Sec. Admin.*, No. 4:20-CV-1111-BJ, 2021 WL 5854272, at *7 (N.D. Tex. Dec. 9, 2021) (finding that the ALJ properly considered the supportability and consistency of a consultative examiner's opinion that was not supported by the examination findings and was inconsistent with both the findings in the treatment record and the plaintiff's own statements about her functioning).

Moreover, because it is a brief and conclusory opinion that lacks accompanying diagnostic tests or specific clinical examinations, except a vague handwritten reference to "labs", the ALJ could properly discount portions of Internist's questionnaire as lacking substantive explanation. *See Fletcher v. Comm'r, SSA*, No. 4:21-CV-00173SDJCAN, 2022 WL 3130860, at *9 n.8 (E.D. Tex. June 21, 2022) (finding that the ALJ properly determined the persuasiveness of physician's two medical source statements completed months after examination of plaintiff and "contain[ing] no information as to why the objective evidence supported the severity of the limitations indicated", except for stating they were based on plaintiff's "MRI(s)"), *report and recommendation adopted*, No. 4:21-CV-173-SDJ, 2022 WL 3107905 (E.D. Tex. Aug. 4, 2022). The ALJ's reasons for finding Internist's questionnaire "not persuasive", combined with her review and analysis of the objective record, satisfy her duty under the regulations. *See Anthony D.*, 2021 WL 9315235, at *5.

Plaintiff also argues that the ALJ erred by not specifying with which evidence at the hearing Internist's questionnaire is inconsistent. (doc. 15 at 21.) The ALJ's opinion discussed Plaintiff's testimony, her reported daily activities, and summarized the medical evidence before evaluating

the medical opinions. (*See* doc. 10-1 at 21-31 (citing *id.* at 319-41, 355-81, 462-63, 467-74, 540-43, 718-35); doc. 15 at 21.) Plaintiff does not object to the ALJ's summary of the medical evidence or point to any evidence that would have supported Internist's opinion that the ALJ did not consider. (*See* doc. 15.) The ALJ's decision satisfies the required discussion of an opinion's supportability and consistency under the regulations, and she did not err. *See Ray H. v. Comm'r of Soc. Sec.*, No. 4:21-CV-1709, 2022 WL 3566844, at *4 (S.D. Tex. Aug. 17, 2022) (finding the ALJ did not err in failing to specify with which "pieces of evidence" in the record and at the hearing the medical opinion was inconsistent, because the ALJ discussed Plaintiff's testimony, daily activities, medical records, and Plaintiff did not object to the summary of the evidence or point to any evidence to support that medical opinion).

### 2.  *Rheumatologist's Fibromyalgia Questionnaire*

Rheumatologist physically examined Plaintiff in February 2018. (doc. 10-1 at 319-41.) Plaintiff had diffuse tenderness over the fibromyalgia tender points and mild pain in the lumbar spine with flexion or extension, but she was in no acute distress, had normal gait and station, and had been able to tolerate pain symptoms better since starting Cymbalta several months earlier. (*Id.* (citing *id.* at 320-27.)) Nurse Practitioner, who worked with Rheumatologist, physically examined Plaintiff in August 2020. (*Id.* at 718-24.) Plaintiff had decreased range of motion and diffuse tenderness over the fibromyalgia tender points but no acute distress, negative straight leg raises bilaterally, normal gait and station, and 5/5 muscle strength in the bilateral deltoids and 4/5 in the bilateral triceps, biceps, hip flexors, and quadriceps. (*Id.* at 24-25 (citing *id.* at 720.))

The ALJ considered Rheumatologist's August 2020 fibromyalgia questionnaire, a check-box form identical to the one completed by Internist, and his opinion that:

> [Plaintiff] could not lift less than ten pounds frequently and ten pounds occasionally on a consistent basis in a work situation. She could not consistently perform work requiring her to be on her feet more than two hours in an eight-hour workday. [She] can occasionally reach overhead, reach forward, handle, and finger with the bilateral arms and hands. She will likely require thirty minutes of additional breaks due to her symptoms. [She] would likely be absent eight days per month on average due to her symptoms.

(*Id.* at 31 (citing *id.* at 729-32)) (internal citations omitted). The ALJ expressly found Rheumatologist's opinion was "not persuasive" because it was inconsistent with the "normal examination findings" in his treatment records. (*Id.* at 31.) Her decision reflected consideration of the treatment notes by Rheumatologist and Nurse Practitioner. (*Id.* at 21-22, 24-25 (citing *id.* at 320-27, 719-24.)) She specifically noted that in his most recent examination, more than 2 years earlier, Rheumatologist expressly found that despite tenderness and mild pain, Plaintiff's "[f]ibromyalgia symptoms [we]re stable" and "[s]he had been able to tolerate pain symptoms better since she started on the Cymbalta." (*Id.* at 31 (citing 325.)) She also considered the other treatment records that showed that Plaintiff had normal gait and station and 5/5 strength, although 4/5 strength in August 2020. (*Id.* at 22-31 (citing *id.* at 325, 712, 715, 720.)) She further considered Plaintiff's daily activities; "the location, duration, frequency, and intensity of [her] pain or other symptoms", such as 9/10 pain and chronic pain shooting up to her jaw; "factors that precipitate and aggravate [her] symptoms"; and her medication (e.g., dosage, type, effectiveness, side effects, compliance). (*Id.* at 31-32 (citing *id.* at 52-53, 55, 259-66, 550, 719.)) She also expressly considered Pain Physician's July 2020 treatment note and his finding that "[Plaintiff] had become unresponsive to conservative care including physical therapy, non-opioids, and opioid pain medications." (*Id.* at 713-14.) By properly considering and summarizing all the record, the ALJ did not err in determining the persuasiveness of Rheumatologist's questionnaire. *See Donohue*,

2021 WL 5854272, at *7; *see generally Colorado v. Saul*, No. EP-20-CV-00200-FM, 2021 WL 8053505, at *5 (W.D. Tex. Feb. 11, 2021) (finding that substantial evidence supported the ALJ's RFC determination with respect to Plaintiff's fibromyalgia).

Moreover, because it was a brief and conclusory questionnaire that lacked accompanying diagnostic tests or specific clinical examinations (except a handwritten reference to look in medical records) and did not identify her positive tender points, the ALJ could properly discount portions of the questionnaire as lacking substantive explanation. *See Fletcher*, 2022 WL 3130860, at *9 n.8; *Stephens*, 2020 WL 7122860, at *20; *Foster*, 410 F. App'x at 833. Notably, Rheumatologist did not explain how Plaintiff's condition had changed since he last examined her more than 2 years earlier, or since Nurse Practitioner had last examined her merely 17 days earlier, when Plaintiff had negative straight leg raises bilaterally, normal gait and station, and 5/5 muscle strength in the bilateral deltoids. *See Fletcher*, 2022 WL 3130860, at *9 (finding that the medical opinion's "significant, unexplained inconsistencies" in the doctor's assessments of the plaintiff's functional abilities "undermine the persuasiveness of all of her opinions" because there was no "cogent explanation" for the changes to the doctor's assessments or citation to medical evidence from another source as a basis for the changes); (*compare* doc. 10-1 at 729-31, *with id.* at 319-41, 718-24). The ALJ's reasons for finding Rheumatologist's questionnaire "not persuasive", combined with her review and analysis of the objective record, satisfy her duty under the regulations. *See Anthony D.*, 2021 WL 9315235, at *5.

### 3. *Psychologist's Opinions*

Plaintiff contends that the ALJ failed to properly consider the persuasiveness of Psychologist's consultative examination and medical source statement. (doc. 15 at 21-23.)

30

### a. Psychologist's Consultative Examination Assessment

Psychologist performed a consultative examination on Plaintiff in April 2019. (doc. 10-1 at 467-74.) Plaintiff was alert and oriented times four, had participated "appropriately" in the interview, and there was no evidence of loose associations, flight of ideas, circumstantial speech or tangential speech. (*Id.* at 22 (citing *id.* at 467-72.)) She had average intelligence, good immediate memory, good judgment and stable affect, but she had problems focusing. (*Id.* (citing *id.* at 470.)) She recalled her age, birthdate, the examiner's name, the presidents' names from Trump to Bush, three words out of three immediately on one trial and one out of three words after a five-minute delay, but she was unable to do serial sevens. (*Id.*) She was able to read a sentence and follow directions, repeat and write a simple sentence, copy a simple design accurately and repeat six numbers forward but not backward. (*Id.*) Plaintiff was diagnosed with major depressive disorder, recurrent, severe and a somatic symptom disorder, with predominant pain, persistent, moderate. (*Id.* (citing *id.* at 471.))

> The ALJ considered Psychologist's assessment of the consultative examination:
>
> [Plaintiff] … c[ould] understand, remember, and apply information. She ha[d] the abilities to learn, recall, and use information to perform work activities. She c[ould] carry out tasks with three or more step oral instructions and use reason and judgment to make work-related decisions. She ha[d] the abilities to relate to, and work with, supervisors, coworkers, and the public. *She would struggle to concentrate, persist, and maintain pace with the abilities to focus attention to work activities and stay on task at a sustained rate.* She c[ould] adapt and manage herself.

(*Id.* at 29-30 (citing *id.* at 471)) (internal citations omitted and emphasis added). The ALJ expressly found that Psychologist's "broad opinion" as to Plaintiff's struggle to concentrate, persist and maintain pace was "generally unpersuasive" because it was "vague" as to degree, and it was "inconsistent" with the examination and the other hearing evidence. (*Id.* at 30.) She found that the

other portions of the assessment were "generally persuasive" because they were consistent with the findings of her examination and the evidence at the hearing. (*Id.*) The ALJ's decision specifically stated that "the evidence does not support [Plaintiff]'s description of limitations." (*Id.* at 29.) It noted that Psychologist's consultative examination reflected that Plaintiff was unable to do serial sevens and had some problems focusing and could not accurately repeat six number backwards, but she could spell the word "world" forward and backwards, repeat a simple sentence, recall three words immediately on one trial but only one out of three words after a five-minute delay. (*Id.* (citing *id.* at 467-74.)) Plaintiff's other treatment records noted she had normal "mini-mental status exams". (*Id.* (citing *id.* at 560-98.)) The ALJ further noted that "in light of the nature of [Plaintiff]'s fibromyalgia and her psychological impairments", she had given Plaintiff's description of her limitations "the widest latitude possible" and limited her to perform "simple, routine tasks and make simple work-related decisions." (*Id.*)

By considering how Psychologist's assessment of Plaintiff's moderate limitation in concentration, persistence and pace was partly unsupported by and inconsistent with the consultative examination, the treatment record, and Plaintiff's statements, the ALJ discussed the supportability and consistency of Psychologist's assessment with the other evidence. *See Dominick S.*, 2022 WL 2874705, at *4 (finding ALJ satisfied the required discussion because his "narrative explanation" described plaintiff's moderate mental limitation as supported by and consistent with plaintiff's own reports, other evidence of his poor ability to concentrate and focus, "essentially normal mental status examinations" and similar SAMC opinions); *Raymond S. v. Kijakazi*, No. 3:20-CV-01773-N-BT, 2021 WL 6335203, at *4-5 (N.D. Tex. Dec. 7, 2021), *report and recommendation adopted*, No. 3:20-CV-01773-N-BT, 2022 WL 79845 (N.D. Tex. Jan. 7, 2022)

(finding the ALJ committed no error in not giving [consultative examiner]'s opinion more weight because its findings were not consistent with the record even if the opinion was supported by observations during her evaluation). Moreover, the ALJ's reasons for finding Psychologist's assessment "generally unpersuasive" as to Plaintiff's ability to concentrate and persist, combined with her review and analysis of the objective record, satisfy her duty under the regulations. *See Anthony D.*, 2021 WL 9315235, at \*5.

### b. Psychologist's Medical Source Statement

The ALJ considered Psychologist's September 2020 medical source statement, a check-box form that was based on the consultative examination. (doc. 10-1 at 734-35.) It stated that Plaintiff had 15 limitations of varying degrees and at least one serious or extreme limitation in each area of mental functioning. (*Id.*) The ALJ expressly found that Psychologist's medical source statement was "not persuasive" because "[t]he findings of extreme or serious limitations [we]re inconsistent with her own examination findings, … her prior opinion and the evidence received at the hearing." (*Id.* at 30.)

Because Psychologist's medical source statement is a brief and conclusory check-box form that does not state why the consultative examination supported the limitations she identified, the ALJ could properly determine the examination did not support the severity of limitations that Psychologist opined. *See Fletcher*, 2022 WL 3130860, at \*9 n.8; *Stephens*, 2020 WL 7122860, at \*20; *Foster*, 410 F. App'x at 833. Moreover, because there were no intervening examinations between Psychologist's examination and her medical source statement, which was completed almost 17 months later, and she identified more (or more severe) limitations in her statement than in her examination without explanation, the ALJ did not err in finding that the statement was

33

unsupported and inconsistent. *See Fletcher*, 2022 WL 3130860, at *8-9; *see also Jones v. Colvin*, No. 4:13-CV-818-A, 2015 WL 631670, at *4 (N.D. Tex. Feb. 13, 2015) (finding that the "internal inconsistencies" between a physician's examination and her medical source statement, as well as the "inconsistencies" between her treatment records and the other medical evidence of record, went to the supportability and consistency of her opinion under the prior regulations). The ALJ's reasons for finding Psychologist's medical source statement "not persuasive", combined with her review and analysis of the objective record, satisfy her duty under the regulations. *See Anthony D.*, 2021 WL 9315235, at *5.

In conclusion, because the ALJ's decision considered the supportability and consistency of the opinions of Internist, Rheumatologist and Psychologist, and gave "careful consideration of the entire record", including the medical and non-medical evidence and prior administrative medical findings, in accordance with the requirements of 20 C.F.R. § 416.920c, her RFC determination is supported by substantial evidence. *See Hill v. Saul*, No. 3:20-CV-1914-BH, 2022 WL 975608, at *14 (N.D. Tex. Mar. 30, 2022) (finding that the ALJ properly addressed the supportability and consistency factors and that, because his RFC determination was based on medical evidence in record, it was supported by substantial evidence); *Georgopoulos*, 2022 WL 3023247, at *9 (same). She "built a discernible logical bridge between the persuasiveness of [the treating physicians and the consultative examiner]'s opinions and those opinions' supportability by and consistency with the record as a whole." *See Wendy M. B. v. Kijakazi*, No. 3:20-CV-02957-BT, 2022 WL 2704038, at *5 (N.D. Tex. July 11, 2022). Remand is not warranted on this issue.

**B.  Subjective Complaints/Symptoms**

Plaintiff also contends that the ALJ applied the wrong standard under SSR 16-3p. (doc. 15

at 28.) She argues that "[b]y imposing an 'entirely consistent' standard, rather than [the SSA]'s reasonableness standard'", the ALJ improperly "required [her] reported symptoms to be 'entirely consistent' with the medical and other evidence of record" and "ignored evidence that supported [her] reported symptoms". (*Id.*)

Under the Social Security Regulations, the ALJ is required to follow a two-step process for evaluating a claimant's subjective complaints. *See* 20 C.F.R. §§ 404.1429, 416.929; SSR 16-3P, 2017 WL 5180304, at *2-3 (S.S.A. Oct. 25, 2017).[12] First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *See* SSR 16-3P, 2017 WL 5180304, at *3-4. Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *See id.* at *4-5. The ALJ is to consider the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. *See id.* at *5-7. The ALJ must also consider a non-exclusive list of seven relevant factors in evaluating the intensity, persistence, and limiting effects of a claimant's symptoms:

1.  Daily activities;

---

[12] Effective March 2017, the Social Security Administration issued Social Security Ruling 16-3p, which eliminated the "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." *See* SSR 16-3p, 2017 WL 5180304. It instructs ALJs to determine "the extent to which ... symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the [claimant's] record" and simply shifts the focus from a more general analysis of a claimant's truthfulness to an objective comparison of a claimant's statements to the evidence of record. *See Howard v. Berryhill*, No. 3:16-CV-318-BN, 2017 WL 551666, at *6 (N.D. Tex. Feb. 10, 2017). While SSR 16-3p explicitly supersedes SSR 96-7P, "it is evident that the change brought about by SSR 16-3p was mostly semantic." *Id.* at *7 (collecting cases).

2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual uses or has used to relieve pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *7-8; *see also* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

Although the ALJ must give specific reasons for making this determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *See Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994). The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991). The ALJ is in the best position to assess a claimant's credibility because she "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco*, 27 F.3d at 164 n.18.

District courts across the country, including one in this circuit, have held that the "not entirely consistent" phrase in an ALJ's findings as to a claimant's statements concerning the intensity, persistence, and limiting effects of her symptoms, is boilerplate language that is inconsequential where the ALJ considered the evidence of record and articulated her reasoning for

36

discounting Plaintiff's allegations. *See Hughes v. Comm'r of Soc. Sec. Admin.*, No. 6:21-CV-02277, 2022 WL 2525395, at *8 (W.D. La. June 21, 2022), *report and recommendation adopted*, No. 6:21-CV-02277, 2022 WL 2513438 (W.D. La. July 6, 2022) (finding that the "not entirely consistent" phrase is boilerplate language and not a statement about the standard used but rather "an acknowledgment that there are inconsistencies between the [plaintiff's] subjective symptoms … and the other evidence in the record"); *Thelmarae W. v. Saul*, 476 F. Supp. 3d 717, 725 (N.D. Ill. 2020) (reported) (finding that the "not entirely consistent" phrase, "like most common boilerplate, is essentially meaningless to … court[s] charged with reviewing the ALJ's reasoning" that "have generally … concern[ed] themselves with whether the ALJ gave an account of his reasons for disbelieving the plaintiff's complaints."); *Brian J. v. Saul*, 438 F. Supp. 3d 903, 910 (N.D. Ill. 2020) (reported) (finding the ALJ's use of the "boilerplate language, 'not entirely consistent', is harmless as the ALJ thoroughly analyzed the evidence and thoroughly explained the reasons for her conclusions"); *Richardson v. Saul*, 565 F. Supp. 3d 154, 170 (D.N.H. 2021) (reported) (rejecting "the argument that an ALJ's use of a phrase like 'not entirely consistent' is evidence that the ALJ applied an incorrect standard, in particular where … the ALJ's deployment of the phrase is followed by a discussion that is consistent with the appropriate standard"). The court finds the reasoning of these courts persuasive and adopts it.

Here, after determining that Plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were "not entirely consistent" with the medical evidence and other evidence of record, the ALJ articulated the evidence and reasons for her conclusions. (*See* doc. 10-1 at 28-29.) She considered Plaintiff's normal or unremarkable musculoskeletal exams, normal gait and station, "mild" findings on physical exams, 5/5 motor strength and normal

sensation in all test areas (except in August 2020), and the lack of evidence showing instability in the bilateral knees. (*Id.* at 28-29 (citing *id.* at 325-26, 333, 711-12, 715, 720).)) The ALJ also considered Plaintiff's problems focusing, doing serial sevens, or recalling three words after a five-minute delay, as well as her normal mini-mental status exams, ability to spell "world" backwards and forward, repeat a simple sentence, recall three words immediately on one trial. (*Id.* at 29 (citing *id.* at 470).)) The ALJ found that although Plaintiff's impairments were not as restrictive as she alleged, they were indeed "severe", so she limited Plaintiff to a "reduced range of work at the [l]ight exertional level." (*Id.* at 29.) Additionally, considering Plaintiff's fibromyalgia and psychological impairments, and expressly giving them "the widest latitude possible", she limited Plaintiff to "perform simple, routine tasks and make simple work-related decisions." (*Id.*) The ALJ's use of the "not entirely consistent" phrase is therefore harmless because she gave careful consideration to the entire record and specifically referenced the evidence to explain why she discounted Plaintiff's allegations. *See Hughes*, 2022 WL 2525395, at *9 ("It is sufficient for the ALJ to include in his ruling specific references to the evidence and specific reasons for his findings showing that the relevant regulatory factors were considered."); *see also Brian J.*, 438 F. Supp. at 910 (finding that the ALJ's "subjective symptom evaluation" was supported by "'specific reasons supported by the record,'" and Plaintiff did not show that it was "patently wrong") (citations omitted). The ALJ properly considered Plaintiff's symptoms under SSR 16-3p, and remand is not required on this issue.

## IV.    RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED** on this 29th day of August, 2022.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

### INSTRUCTIONS FOR SERVICE AND
### NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE